UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

KAREN ELLMANN,                    )
                                  )
        Plaintiff,                )
                                  )
        v.                        )          Cause No. 2:17-CV-00361-PPS
                                  )
AMSTED RAIL COMPANY, INC.,        )
                                  )
        Defendant,                )

## OPINION AND ORDER

Karen Ellmann claims that she was discriminated against because of her sex by

her former employer, Amsted Rail Company, Inc.  As the Human Resources Manager

for Amsted from around 2014 to 2016, Ellmann's job duties included labor relations

between Amsted and United Steel Workers Local 2003 ("USW"), the labor organization

that represents Amsted's union employees.  Ellmann was fired by Amsted citing what it

says was her poor performance in managing labor relations with the union.  Ellmann

says she was fired because she is a woman. She also claims that she was subjected to a

hostile work environment, and that when she filed a complaint about the

discriminatory workplace, she was retailed against.  Amsted seeks summary judgment

on all claims.  For the reasons discussed below, the motion for summary judgment is

**GRANTED IN PART**.  Summary judgment is warranted on the Title VII discrimination

claim and hostile work environment claim.  But a reasonable jury could conclude that

Ellmann was retaliated against.

**Factual Background**

After working with the company since 2011, Ellmann accepted a promotion in 2014 to HR Manager at Amsted's facility in Hammond. [Ellmann Dep. at 28-32.] Ellmann's responsibilities included administering the collective bargaining agreement and maintaining good relations with union leadership, including frequent interaction with union chairperson, Eli Maya. [Luce Dep. at 78.] Additionally, Ellmann was expected to balance the interests of Amsted while also being an advocate and serving the needs of the union employees. [*Id.* at 59.] As the Hammond HR Manager, Ellmann originally reported to the facility General Manager, Mike Reeder. [Reeder Dep. at 11.]

Within the first two or three months of her arrival at the Hammond plant, Ellmann began having problems with Maya. [Ellmann Dep. at 47.] These difficulties included comments from Maya about Ellmann's ability to do her job and questioning Ellmann's value at the company while using an aggressive tone. [*Id.* at 81.] Maya reported to Reeder that Ellmann had spoken with a condescending tone to union employees. [Reeder Dep. at 21.] Reeder spoke with Ellmann about the issue, but took no formal disciplinary action. [*Id.* at 22.]

In January 2015, Reeder completed Ellmann's annual performance evaluation for October 1, 2013 - September 30, 2014, and Ellmann received an overall rating of "4.0 — Outstanding" with positive comments. [*Id.* at 28-30.] Indeed, Reeder wrote the following comments at the end of Ellmann's review:

> [Ellmann] has done an outstanding job of taking control of the
> human resource function and providing leadership and structure

> that was missing. . . .  She has adapted very well to a union
> environment and understands when to seek guidance in those areas
> where she is not fully knowledgeable (mainly union contract issues
> and historical precedents).  [Ellmann] has done a very good job in
> identifying gaps in HR systems and procedures and implementing
> actions to correct.  Her integrity is above reproach; people are
> comfortable talking to [Ellmann] about their respective issues.

[*Id.* at 29-30; Reeder Dep. Ex. 16 at 9-10.]

In late 2014 or early 2015, Director of Human Resources, Chris Dockery, took an oversight role with Hammond.  [Dockery Dep. at 9-11, 22.]  Dockery quickly observed shortcomings in Ellmann's performance.  [Dockery Dep. at 27.]  Dockery noted Ellmann did not know when employees had been terminated or the reasons for termination.  [*Id.*] After an episode where HR was not involved in an employee termination, Dockery notified Ellmann that HR must always be involved.  [*Id.* at 28-30.]  Another employee was then discharged despite Ellmann being instructed to first discuss the termination with Dockery and Luce.  [*Id.* at 30-31.]  Dockery also noted the grievance process and company-led meetings had no structure, and relayed these concerns to Ellmann.  [*Id.* at 27-28.]

Around October 2015, Amsted negotiated a new contract with the union.  [Luce Dep. at 80.]  The bargaining team included Wayne Luce (Vice President of Human Resources), Dockery, Reeder, Ellmann, and Carey Bumgardner on behalf of Amsted, and Maya and four other people for USW.  [*Id.* at 80-81.]  During the negotiations, Maya publicly accused Ellmann of causing problems in labor relations.  [*Id.* at 83.]  Ellmann did not respond to the outburst, and managed to handle the situation very calmly.  [*Id.* at 84.]  Luce had observed Maya act aggressively in the past, but had never seen a

personal attack towards management like this; nevertheless, Luce blamed Ellmann (and not Maya) for their poor working relationship. [*Id.* at 85-86.] Maya told Luce that he did not trust Ellmann – she was condescending and belittling in her interaction with union membership, not competent in administering the collective bargaining agreement, and not promoting good relations. [Luce Dep. at 71.]

After the negotiation, Luce and Dockery took Maya aside and told him Dockery would help Ellmann improve the situation. [*Id.* at 84-85.] Luce then told Ellmann that she needed to build a better relationship with Maya. [Ellmann Dep. at 97-98.] While Luce acknowledged the outburst must have been uncomfortable for Ellmann, Luce told Ellmann what happened during the negotiation was "horrible" and it can't happen again. [Luce Dep. at 90-91.] Ellmann didn't think her job was in jeopardy at this point because in her experience, Luce's practice was to require documentation of any performance issues, and Ellmann was not put on a performance improvement plan. [Ellmann Dep. at 105-07; Luce Dep. at 113-14.]

Ellmann then met with Reeder to discuss a plan to improve her work relationship with Maya. [Ellmann Dep. at 98.] Ellmann agreed to meet with Maya more regularly to become more acquainted and build a better relationship, so they began having weekly one-on-one meetings. [*Id.* at 98-99; 181.]

Review time came around again and in Ellmann's 2015 review, Reeder rated Ellmann lower than her previous review with a "3.0—Strong," including positive and constructive comments and giving her objectives for the coming year including: (1) creating a development training plan for salaried employees and executing training

4

needs; and (2) developing and executing a training program for the maintenance departments, referred to as the MMC program. [DE 69-6.] Reeder wrote in the review that Ellmann "has shown a true caring for the people and always looks to find the best balance between company and people's interests." [Reeder Dep. at 33; Dep. Ex. 17 at 6.]

As of early 2016, Dockery still noted concerns with Ellmann's performance, including missed deadlines, poor response times, and continued deficiencies in labor relations. [Dockery Dep. 70-73.] Dockery relayed these concerns directly to Ellmann. [Luce Dep. at 91.] Although Luce and Dockery thought Luce made it clear the need to improve labor relations and the potential impact on Ellmann's continued employment, at no point did Dockery tell Ellmann she would be terminated if she did not improve her relationship with Maya, and they never put Ellmann on a performance improvement plan. [Luce Dep. at 113-14; Ellmann Dep. at 189-90.] Luce instructed Dockery to provide coaching and training to Ellmann. [Luce Dep. at 91.] Subsequently, Ellmann was provided on-the-job training about labor relations by Dockery. [Dockery Dep. at 48-55.]

Larry Moore is an employee that Ellmann argues was treated differently than her even though they were similarly situated. Moore was the HR Manager at the Hammond plant from approximately 2002 – 2011, and then switched to the safety manager. [Ellmann Dep. at 38.] When Moore was the HR manager, he did not receive any discipline, corrective action, or performance improvement plans. [Luce Dep. at 60.] By the time Ellmann was the HR manager, Moore was the safety manager. [Ellmann Dep. at 38.] Moore, like Ellmann, also reported to Reeder. [*Id.*, Reeder Dep. at 11-12.]

Maya and the union had problems with Moore as the safety manager because Moore was slow to fix things and respond to safety issues reported by the union. [Maya Dep. at 34.] Moore received coaching on the need to have a better sense of urgency when resolving safety issues. [Luce Dep. at 61.] After the 2015 contract negotiations, Moore and Maya attended off site counseling with each other to attempt to build their relationship. [Maya Dep. at 37-38.] In late 2015, Amsted placed Moore on a performance improvement plan due to errors and inaccurate recordkeeping in OSHA logs of recordable incidents. [Luce Dep. at 62-65.]

In April 2016, Kevin Skibinski began transitioning into the Hammond General Manager position because Reeder was promoted to a different operation. [Skibinski Dep. at 10-11.] Skibinski quickly noticed tension among the workforce based on plant-wide meetings and employee complaints. [*Id.* at 25-26.] In June 2016, Skibinski emailed Dockery stating "intense plantwide meetings this week. Numerous personal attacks and evident [Ellmann] and Moore are not in good standings with union." [*Id.* at 25; DE 69-9.] Skibinski thought that the union's issues with Moore were "more serious" because they were safety related. [Skibinski Dep. at 26-27.]

Maya complained to Skibinski that Ellmann was difficult to work with, failed to follow up on things, was unprepared or had inaccurate information for meetings, walked out of meetings with the union, failed to schedule grievance meetings timely, and was condescending to employees. [*Id.* at 30.] According to Skibinski, while complaints from unions are not uncommon, in Ellmann's case, Skibinski thought the complaints were "becoming very excessive." [*Id.*]

In August 2016, Skibinski met with Ellmann regarding the MMC program (a maintenance development program), one of the tasks outlined in her review. [Skibinski Dep. at 38-40.] Amsted received several complaints that Ellmann had allegedly not completed timely audits for the MMC program and that the employees were unable to be ranked a rating of "5" within the program (foreclosing them from receiving a corresponding pay increase). [*Id.*] Ellmann tried to explain, and denied that she locked out employees from receiving a "5" rating, however Skibinski removed the program from Ellmann's responsibilities, but still took no disciplinary action against her. [Ellmann Dep. at 136-38; Skibinski Dep. at 39-40.] Ellmann did not take the revocation to mean that he was blaming her for the problems within the MMC program. [Ellmann Dep. at 139.]

In early September 2016, Skibinski explained that he would not be giving Ellmann credit for two of her personal goals for incentive pay that were identified in her 2015 review. [Skibinski Dep. at 41.] In addition to audits not being conducted within the MMC program, Skibinski informed Ellmann that not all salaried employees in Hammond had development plans, which was another goal for Ellmann. [DE 67-12 at 4.] While Ellmann agreed that the tasks were incomplete, she disagreed that it was her fault. [Ellmann Dep. at 139-40.]

Later that same month, in mid-September 2016, Ellmann left a grievance meeting because she became upset when Maya called her out in front of superiors. [Skibinski Dep. at 45.] Specifically, Maya said that Ellmann was lying, and Ellmann became upset and left the meeting. [Maya Dep. at 82.] Ellmann returned to the meeting a few

minutes later, and the meeting was concluded without further incident. [Maya Dep. at 82-84.] Later the same month, Skibinski e-mailed Dockery, outlining more of his concerns with Ellmann's performance, including that Ellmann was not prepared for a meeting and she made a facial expression in a meeting about an employee's retirement check which implied, "wow, that's all you are getting?" [Skibinski Dep. at 33-37.]

In late September 2016, USW began circulating a petition to union employees calling for Ellmann to be removed from her HR position. [Maya Dep. at 96; DE 67-6.] The petition stated as follows:

> We the USW Local 2003 are requesting that Karen Ellman [sic.] be removed from her position as HR. She has been very unprofessional to the workers. Our union officials have brought this issue up to management and Karen continues to treat employee [sic.] very unprofessional and unfair. We are asking you please take this matter very serious.

[DE 67-6 at 2.] According to Maya, he put the petition together at other employees' request. [Maya Dep. at 92-93.] When Ellmann heard about the petition circulating, Skibinski told her something along the lines that the union does not tell him how to run the plant, and he made it clear that the petition would not influence Amsted's decision. [Skibinski Dep. at 43-44.]

Maya delivered the signed petition to Skibinski on September 29, 2016. [*Id.* at 42; 46.] It was signed by 73 of the 75 - 80 employees. [Ellmann Dep. at 82.] After receiving the petition, Skibinski advocated for Ellmann's immediate termination because the relationship with the union was clearly not improving, and the petition was an affirmation of the ongoing issues. [Skibinski Dep. at 48.] Luce believed that not only

had there been no improvement in labor relations, the situation had become "a disaster." [Luce Dep. at 120, 146-47.] However, Dockery and Luce had concerns with giving the union the idea that it was dictating management personnel decisions, so they considered placing Ellmann on a performance review scheduled to end in January. [*Id.* at 115-20.] Moreover, Luce also did not want to put Ellmann on a performance improvement plan because he thought that documentation would hurt Ellmann's career going forward. [*Id.*]

Luce made the decision that he was going to give Ellmann a "soft landing." This meant that she needed to start looking for another job but there was no present plan to terminate her. [*Id.* at 117-18.] To that end, on October 20, 2016, Skibinski and Dockery met with Ellmann and told her that because of her job performance and failure to build labor relations, she should start looking for another job, which may be easier for her while she was still employed. [Skibinski Dep. at 50; Dockery Dep. at 91-93.] Ellmann would otherwise be facing a low performance rating and performance improvement plan. [Dockery Dep. 91-92.] Although they anticipated giving Ellmann a six-month time period to find a job, things did not ultimately play out that way. [Luce Dep. at 126.] For her part, Ellmann says the "soft landing" approach was nothing more than "paternalism." [DE 68 at 9.]

The petition and buildup of hostility towards Ellmann caused her great stress, and she was fearful for her safety at the plant because Ellmann was aware of prior incidents where union employees had made death threats against a female HR

manager, and Ellmann feared that if they were signing a petition calling for her removal, she could become a target of death threats as well. [Ellmann Dep. at 178-79.]

On November 1, 2016, Ellmann emailed a gender discrimination and harassment complaint to Luce. [*Id.* at 119; 69-2.] This was her first harassment allegation. [Ellmann Dep. at 121.] On November 9, 2016, Luce sent Tom Peterman, Amsted's internal counsel, a response to Ellmann's complaint. [DE 69-3.] Peterman investigated Ellmann's complaint and interviewed Ellmann, Skibinski, Dockery and Maya. [Ellmann Dep. at 121; Luce Dep. at 149-50.]

Ellmann also submitted a retaliation complaint via email to Peterman on November 18, 2016, because Maya was continuing to use aggressive behavior and Skibinski insinuated that if Ellmann did not take care of an issue regarding a benefit change, Maya would react to her in his usual aggressive and hostile way. [DE 69-4.] Ellmann felt that Maya and Skibinski's actions towards her were in retaliation for the complaint against them for gender discrimination and hostile work environment. [*Id.*] After Peterman, the in-house counsel, completed his investigation, he sent Ellmann an e-mail on December 7, 2016, stating that he found no support for the allegations of discrimination and hostile environment based on her gender. [DE 67-14.]

On December 15, 2016, Skibinski emailed Luce and Dockery his running performance log of Ellmann, and a summary of a meeting where union employees thought Ellmann was being inconsistent answering questions and confusing. [DE 67-13.] The log shows, with increasing frequency in October and November 2016, days where Ellmann stated she would not be in the office, or that she was calling in sick. [*Id.*]

Additionally, from November 18, 2016, through December 13, 2016, there are six entries documenting Ellmann either calling in sick, or coming in late (around 8:30-9:00 a.m.), or requesting to leave the office to pick her son up at school. [*Id.*] Ellmann filed her charges of discrimination with the EEOC against Amsted on December 16, 2016.

Sometime in the few days after Skibinski e-mailed his performance log of Ellmann to the others, Luce made the decision to terminate Ellmann's employment after discussing the issue with Dockery and Skibinski. [Luce Dep. 157-58.] In addition to the core issue of Ellmann's inability to positively affect labor relations, Luce stated that he believed Ellmann's attitude had changed by becoming more contentious with union employees, union leadership, Dockery and Skibinski. Luce thought that Ellmann's performance also deteriorated because she was showing up late, calling off, and failing to attend meetings. [*Id.*]

Luce met with Ellmann on December 19, 2016. The soft landing that she was promised turned out to be rock hard. Ellmann's employment was terminated that day. [*Id.* at 170.] Ellmann was replaced by another female, Deborah Simpson. [Ellmann Dep at 163-64, Luce Dep. at 41, 168-69.]

Ellmann admits that from 2015 to October 2016, her difficulties with Maya continued and worsened. [Ellmann Dep. at 106.] She also concedes she did not need to be told labor relations were not improving, but deteriorating. [*Id.*] Ellmann further acknowledges she was unsuccessful in working through conflict. [*Id.* at 36.]

Meantime, Larry Moore, the safety supervisor, continued to have performance issues. The issues with his performance came to a head on January 13, 2017, when

Skibinski completed his 2016 performance review. Moore was assigned an overall rating of "1.0—needs improvement," and he was placed on a performance improvement plan shortly thereafter. [Skibinski Dep. at 51-52.] Moore was on a performance plan for 6-8 months, but continued to have performance issues. [*Id.* at 53-54.] Moore remained employed with Amsted until at least February 2018, and resigned sometime between February and May 2018 probably to avoid termination or further discipline. [Luce Dep. at 66-67.]

## Discussion

### Motion to Strike

Amsted has moved to strike Paragraph 62 of Ellmann's Statement of Facts, arguing it is hearsay and conclusory in nature, and should not be considered in ruling on this motion for summary judgment. [DE 70.] Paragraph 62 describes a text message that a union employee, George Simmons, sent Ellmann after her termination saying his heart was heavy when he found out Ellmann was terminated. [DE 69 at 20-21.] Also, in later communications, Simmons told Ellmann he didn't want to sign the petition, but was pressured to do so, and that the union filed the petition against Ellmann because she was female. [DE 69 at 20-21.] In support, only one text message is attached stating Simmons' condolences. *Id.* The other evidence supporting this paragraph is only Ellmann's deposition testimony. *Id.* In other words, only Ellmann's deposition testimony supports the proposed fact that Simmons told Ellmann that the union filed the petition against her because she is female.

As to the argument that the summary of the text messages in Paragraph 62 is hearsay, on a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 WL 791384, at *2 (N.D. Ill. Feb. 24, 2015); *see also Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) ("We note that the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form.") (emphasis in original). Here, there is no reason that the facts in Paragraph 62 cannot be presented in an admissible form at trial - Ellmann can simply call Simmons at trial to testify to those facts.

Motions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party. *Kuntzman v. Wal-Mart*, 673 F.Supp.2d 690, 695 (N.D. Ind. 2009); *Gaskin v. Sharp Elec. Corp.*, No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind. July 30, 2007). Furthermore, it is the function of this Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement. *See, e.g., S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 392 (S.D.N.Y. 2006); *Sullivan v. Henry Smid Plumbing & Heating Co.*, Inc., No. 04 C 5167, 05 C 2253, 2006 WL 980740, at

*2 n.2 (N.D. Ill. Apr. 10, 2016); *Tibbetts v. RadioShack Corp.*, No. 03 C 2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F.Supp.2d 917, 920 n.1 (N.D. Ind. 2004).

In this case, I have sifted through the voluminous evidence and considered it under the applicable federal rules, giving each piece the credit to which it is due. Accordingly, the motion to strike [DE 70] is denied.

## Motion for Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although employment discrimination cases often turn on factual questions, they can nevertheless be amenable to summary judgment when there is no genuine dispute of material fact or there is insufficient evidence to demonstrate the presence of the alleged motive to discriminate. *Cliff v. Board of Sch. Comm'rs of City of Indianapolis, Ind.*, 42 F.3d 403, 409 (7th Cir. 1994).

Regarding the employment discrimination claims, I note that the Seventh Circuit recently abandoned the separation of "direct" from "indirect" evidence on summary judgment and came to the unremarkable conclusion that "[e]vidence is evidence. Relevant evidence must be considered, and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016). The

Court also reiterated that the "convincing mosaic" is not a legal test. *Id.* Rather, the

Court held that all evidence should be considered together to understand the pattern it

reveals. *Id.* Finally, the Court clarified that its decision did not affect the burden-

shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or any

other burden-shifting framework. *Id.* at 766.

Here, Ellmann asserts claims for sex discrimination, retaliation, and a hostile

work environment. I will address each claim in turn.

## I.     Sex  Discrimination Claim

Title VII prohibits employers from discriminating based on sex. 42 U.S.C.

§2000e-2(a). To succeed in a Title VII lawsuit, a plaintiff must show that (1) she is a

member of a class protected by the statute, (2) she has met her legitimate job

expectations, (3) she has been the subject of some form of adverse employment action,

and (4) similarly situated employees outside of the protected class received more

favorable treatment. *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013) (quoting

*Keeton v. Morningstar, Inc.*, 667 F.3d 887, 884 (7th Cir. 2012)). Summary judgment is

appropriate if the employee fails to establish any one element of a prima facie

discrimination case. *Smith v. Sebelius*, 484 F. App'x 38, 2012 WL 2308732, at *4 (7th Cir.

June 19, 2012). Once Ellmann establishes a prima facie case, the burden shifts to

Amsted to offer a non-discriminatory reason for the employment action. *Morgan*, 724

F.3d at 996. If Amsted can meet its burden, then Ellmann must show the reasons given

by Amsted were really a pretext for discrimination. *Id.*

The parties dispute two main issues: (1) whether Ellmann was meeting legitimate performance expectations; and (2) whether a similarly situated male employee received more favorable treatment.  It is undisputed that Ellmann is a member of a protected class (female), and was subjected to an adverse action (termination).

As evidence that Ellmann was meeting legitimate performance expectations, Ellmann points to her 2014 and 2015 annual performance reviews.  [DE 68 at 5.]  Her overall performance rating was "Outstanding," and "Strong" in those reviews, and they both contained positive and constructive comments.  [DE 69-5; DE 69-6.]  Although it does seem like Ellmann had a good track record several years before she was told to find alternate employment on October 20, 2016, the most important inquiry into performance is *at the time* the employment action is taken.  *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998).  As the *Fortier* court explained, although:

> previous employment history may be relevant and probative in assessing performance at the time of termination, its limited utility must also be recognized. Certainly, earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken. Nor can such evaluations, standing alone, create a genuine issue of a triable fact when, as here, there have been substantial alterations in the employee's responsibilities and supervision in the intervening period.

*Id.*

There are many facts in the record that reflect a decline in Ellmann's job performance after she began working in the union environment.  In 2016, Skibinski transitioned into the Hammond General Manager position and took over completely in

May 2016.  [Skibinski Dep. at 9-11.]  Skibinski immediately heard a concerning amount

of complaints about Ellmann from the union.  [*Id.* at 27-30.]  Next, between October

2015 and her termination in December 2016, Amsted did inform Ellmann that she was

mishandling her responsibilities.  [Luce Dep. at 113-114.]

Ellmann even acknowledged in her deposition that labor relations deteriorated

in 2015 and 2016.  [Ellmann Dep. at 106.]  For example, in October 2015, she was

counseled by Luce and told that the problems in labor relations were severe and could

not continue; and Luce and Dockery thought that they had made it clear that labor

relations needed improvement and this facet of her job could impact Ellmann's

employment.  [Luce Dep. at 90-91; 113-114.]  As of early 2016, Dockery still noted

concerns with Ellmann's performance, including missed deadlines, poor response

times, and continued deficiencies in labor relations.  [Dockery Dep. at 70-75.]  Dockery

then began to mentor Ellmann to improve her job performance by giving advice, sitting

through meetings and having weekly phone calls.  [*Id.* at 47-48; 50-51; 51-59; 66-67.]

Further, in August 2016, Skibinski removed Ellmann from handling a union

development program, because of union frustrations and grievances surrounding her

mistakes.  [Skibinski Dep. at 37-42.]  In September 2016, Skibinski explained to Ellmann

that she failed to meet two of her three goals for the year and this would be reflected in

her next review.  [*Id.*]

The same month, in September 2016, the union delivered a petition to Amsted

calling for Ellmann's removal.  [*Id.* at 42; 46.]  The petition was signed by more than 90%

of the workers and stated that Ellmann should be removed from her position as HR

Manager because she treated the employees unprofessionally and unfair, which was brought up to management in the past by union officials. [DE 67-6.] Even though Amsted management made it clear that it did not have to react to the union's wishes, the petition is an unmistakable piece of evidence reflecting the general disapproval of Ellmann's job performance. [Ellmann Dep. at 81-82; Ex. 67-6.] After an October 2016 meeting, Luce stated that Ellmann's attitude became more contentious with union employees, union leadership, Dockery and Skibinski, and her performance deteriorated more by showing up late, calling off, and failing to attend meetings. [Luce Dep. at 153-57.]

Ellmann argues she was performing up to her legitimate job expectations because there was no official paperwork or disciplinary actions recorded by Amsted. [DE 68 at 6.] But Ellmann does not cite to any case law in support of this argument, and I don't think an absence of official paperwork necessarily means she was meeting her job expectations. *See Barakat v. Taco Bell, Inc.*, 970 F. Supp. 634, 640 (N.D. Ill. 1997) ("[t]he fact that an employer did not follow a progressive discipline program, without some doubt raised as to his genuineness for not doing so, fails to demonstrate pretext.") (citing *Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 403 (7th Cir. 1992) (an employer with a progressive discipline policy is not required to use it)). Moreover, there is no evidence that Amsted even had an official practice requiring written or progressive discipline.

It is clear that Ellmann was not meeting Amsted's expectations based on the meetings she had with management, the steps taken to improve her skills, and,

probably most importantly, the union petition. "A court is not a 'super personnel department that second-guesses employers' business judgments.'" *Riley v. Elkhart Comty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002)). Accordingly, I find that Ellmann has not carried her burden of showing that she was performing up to legitimate employer expectations.

But let's suppose Ellmann could make out a prima facie case. Amsted has nonetheless put forth a legitimate non-discriminatory reason for Ellmann's termination. Ellmann was failing with labor relations, she was contentious with the union and supervisors, and her performance had deteriorated. This is a legitimate reason for termination that is unrelated to Ellmann's sex. *See Roberts v. Separators, Inc.*, 172 F.3d 448, 451-52 (7th Cir. 1999) (explaining poor performance constitutes a legitimate, non-discriminatory, non-retaliatory reason for adverse action); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (affirming summary judgment where employee was terminated for "rude behavior, insubordination, and not recognizing her own inappropriate behavior").

More to the point, Ellmann has not rebutted this legitimate basis with any evidence of pretext. Pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). "Pretext requires more than showing a decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Ballance v. City of Springfield*, 424 F.3d 614, 624 (7th Cir. 2005) (quoting *Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir. 2000)). Aside from Ellmann's personal testimony

that Simmons (the union employee), sent her a text message after her termination stating the union filed the petition against her because she is female, which sounds like nothing more than his naked opinion, Ellmann has not pointed to any statements made about her sex or any remarks whatsoever by any supervisor at Amsted relating to her being a woman that would insinuate she was fired for her gender rather than poor performance. Ellmann has therefore failed to show pretext, as mere speculation of pretext is insufficient. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001) ("[plaintiff's] speculation (and that is all that it is) cannot stand to demonstrate pretext.").

Before moving on to Ellmann's claim of retaliation, there are two other pieces of evidence I want to quickly address, which also both factor against any discrimination. First, Luce participated in the hiring of Ellmann, then promoted her repeatedly to her position of Hammond HR Manager. [Ellmann Dep. at 28-19.] It makes no sense that Luce would, years later, fire Ellmann on the basis of her sex. *See EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir. 1996) (noting "[t]he same hirer/firer inference has strong presumptive value" as a factor in finding nondiscrimination). Second, after firing Ellmann, Amsted filled the HR Manager position with another female. As the Seventh Circuit has noted, it is especially "unreasonable to infer" that termination was based on sex when the plaintiff was replaced by an individual in the same protected class. *Steinhauer v. DeGolier*, 359 F.3d 481, 488 (7th Cir. 2004). For all of these reasons, I find that Amsted is entitled to summary judgment on the sex discrimination claim.

## II.    Retaliation

Ellmann alleges her termination on December 19, 2016, was in retaliation for her November 1, 2016, internal complaint of discrimination.  The anti-discrimination provision of Title VII prohibits an employer from retaliating against an employee because she has filed an employment discrimination claim.  *See* 42 U.S.C. § 2000e-3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006).  The purpose of a retaliation claim is to allow those who believe they have been discriminated against to file complaints comfortable in the notion that the complaint itself will not create some kind of blow back.

"To survive summary judgment on [a Title VII] retaliation claim" a plaintiff must show "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (internal citation omitted).  Amsted does not challenge the first two elements, but rather limits its argument to causation.  The parties do not dispute that cutting short Ellmann's "soft landing" could be an adverse employment action, and I agree since "[a]dverse employment action has been defined quite broadly in this circuit." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (citation omitted).

In turning to the causal connection, Ellmann can demonstrate this by showing that Amsted "would not have taken the adverse … action but for [her] protected activity." *Greengrass v. International Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)

(quoting *King v. Preferred Technical Grp.*, 166 F.3d 887, 892 (7th Cir. 1999)). "Generally, a plaintiff may establish such a link through evidence that the [adverse action] took place on the heels of protected activity." *Dey v. Colt Contr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994).

There is a gap of about seven weeks between the internal gender discrimination and harassment complaint and Ellmann's discharge -- which is not a long time, and yet I'm also not sure whether this timeframe could be described as "on the heels" of Ellmann filing her internal discrimination complaint with the company. [DE 69-2; DE 69-8.] Yet, there are other things in the record that effectively condense the timeframe and make it seem shorter and suspicious. Other events which came even closer to her termination on December 19, 2016 are: Ellmann submitted a retaliation complaint via email to Amsted's counsel on November 18, 2016; Amsted's in-house counsel then announced his finding that Ellmann's complaint was unsubstantiated on December 7, 2016; Ellmann filed her charges of discrimination with the EEOC on December 16, 2016; and then just days later it was quickly decided that Ellmann's "soft landing" -- which was originally intended to last about 6 months -- would be cut short, and she was fired. [DE 69-4, 67-14, DE 1 ¶ 57.]

I do think this timing, combined with other events, raises an inference of retaliation which could lead a reasonable juror to determine that the reasons for the quick termination are mere pretext. *Tibbs v. Admin. Officer of the Illinois Courts*, 860 F.3d 502, 505-06 (7th Cir. 2017) (while suspicious timing alone is rarely enough by itself, presentation of suspicious timing and pretext may defeat summary judgment). First,

the allegations that Ellmann's job performance had deteriorated even further seem trivial and nit-picky, as her performance log included entries near the end like she came in late (between 8:30-9:00 a.m.) or called off sick. [DE 67-13.] Additionally, Luce wrote to the corporate lawyer in response to Ellmann's complaint that, "I absolutely support a practice of ensuring employees have the opportunity to improve prior to a discussion to end an employment relationship . . . . The October 20th discussion with Karen [Ellmann] took place in an attempt to care for her future and reputation as an HR professional . . . . Our intent was to give Karen [Ellmann] some run way to move to a different job more suitable to her skillset. This was not a female issue." [DE 69-3 at 4.] In other words, the plan was to give her some time – six months in fact – to find a more suitable job. But that plan was quickly deep sixed after Amsted was advised of her complaints. Thus, the quick firing seems contrary to company practice. Finally, Ellmann was treated differently than Moore, who continued to struggle even after being placed on a performance improvement plan in late 2015, but Moore (who did not file a discrimination complaint), was retained well into 2018. [Luce Dep. at 64-68.] All of these things could lead a reasonable juror to determine that the proffered reasons for terminating Ellmann in December 2017, and well before the completion of her "soft landing," are really just lies to cover up the true retaliatory intent.

Amsted argues it would have terminated Ellmann even if she had not filed the discrimination complaint, because they had already told Ellmann to start looking for a new job on October 20, 2016. But that is neither here nor there. The adverse employment action in this case is denying Ellmann the additional salary and benefits

she would have had during her anticipated 6-month "soft landing" with the company. It is the sudden decision to fire her, even before that grace period had passed, that a reasonable factfinder could determine was made in response (and retaliation) to Ellmann filing her discrimination complaint. As such, summary judgment is inappropriate on the retaliation claims against Amsted.

### III.    Hostile Work Environment

Ellmann claims that she experienced a hostile work environment during her employment at the Hammond plant and Amsted did not take any action to end the hostile work environment. Specifically, she claims that Maya harassed her by making comments that she did not know how to do her job and the employees did not like her [DE 68 at 14], and that because her predecessor had received a death threat from a union employee, Ellmann feared aggression may escalate against her as well.

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 902 (7th Cir. 2005) (quoting *Cowan v. Prudential Ins. Co. of America*, 141 F.3d 751, 755 (7th Cir. 1998)). To succeed on her claim, Ellmann must establish that: (1) she was subject to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677 (7th Cir. 2005) (citing *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004)).

In analyzing whether the harassment was due to Ellmann's sex, I note that none of the direct comments in the record made by Maya to Ellmann include any discriminatory terms or refer to Ellmann's sex whatsoever. Furthermore, there are statements from Ellmann that Maya was an equal opportunity ogre; he was just as aggressive and "openly hostile" to Moore, a male. [Ellmann Dep. at 85.] In other words, Maya wasn't openly hostile to Ellmann because she was a woman. That appears to be his general disposition in dealing with management when he is unhappy with their performance.

Regarding the petition, Ellmann tries to create an inference that since there was no petition circulated to terminate Moore, the petition against her must have been gender motivated. I cannot jump to that conclusion. There are a variety of reasons that could explain why USW circulated a petition against Ellmann and not Moore – not the least of which is that Ellmann was the union liaison and the relationship between Amsted and the union had become strained and dysfunctional.

What's more, summary judgment is warranted because the harassment in this case was not sufficiently severe or pervasive. In making this consideration, I need to contemplate the totality of the circumstances, including both the subjective and the objective viewpoint. *Quantock v. Shared Marketing Servs., Inc.*, 312 F.3d 899, 903 (7th Cir. 2002). The offensiveness of a plaintiff's work environment is determined by examining all the circumstances, such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Saxton v.*

*American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (quotation omitted).  Even taken

as true, the events Ellmann describes are not objectively severe, physically threatening,

or could reasonably interfere with Ellmann's work performance.  Ellmann first

describes the numerous occasions when Maya used an aggressive tone towards her and

made rude comments about her ability to do her job.  [Ellmann Dep. at 80-81.]  There is

no doubt that Maya's comments are inappropriate, but the offensive utterances do not

meet the standard for being either severe or pervasive.  *See Ezell v. Potter*, 400 F.3d 1041,

1048 (7th Cir. 2005) (rude and inappropriate conduct not sufficiently severe to create

hostile environment).

Regarding the references to past "death threats" that Ellmann thought she could

be the victim of in the future, Ellmann herself was not actually threatened.  [DE 69-14 at

1.]  When comments have been made outside of the presence of the victim, the Seventh

Circuit has declined to call it discrimination.  *See Ngeunjuntr v. Metropolitan Life Ins. Co.*,

146 F.3d 464, 467 (7th Cir. 1998).  Death threats that were made in the past to a different

person cannot create a hostile work environment for Ellmann.

Lastly, Amsted did make strides to work with Ellmann by offering her

counseling by management personnel, and giving her advice and coaching.  [Dockery

Dep. at 48-60.]  Amsted addressed the situation with Maya specifically by planning

with Reeder to improve the relationship. [Ellmann Dep. at 98.]  Amsted also

investigated the hostile work environment claim when it was filed.  [Ellmann Dep. at

122; DE 67-14.]  Consequently, because Ellmann has not shown that the harassment was

sufficiently severe or pervasive, summary judgment is also warranted on the claim for hostile work environment.

## Conclusion

For the reasons set forth above, the summary judgment motion [DE 65] is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to the claims for Title VII sex discrimination (Count I) and hostile work environment (Count III), and the Clerk is **DIRECTED** to **DISMISS** those claims **WITH PREJUDICE**. The motion for summary judgment is **DENIED** as to the Title VII retaliation claim (Count II), and this claim remains pending against Defendant, Amsted Rail Company, Inc.

Defendant's Motion to Strike [DE 70] is **DENIED**.

SO ORDERED.

ENTERED: September 12, 2019.

 /s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT